IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

UNITED STATES OF AMERICA                                                                    PLAINTIFF

V.                         Criminal No. 2:20-CR-20007-PKH-MEF

ROBERT LEE GRANT                                                                            DEFENDANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Defendant, Robert Lee Grant, filed a Motion to Suppress and Brief in Support on June 1, 2020. (ECF No. 17). The Government filed its Response on June 8, 2020. (ECF No. 20). The matter was referred to the undersigned for report and recommendation on June 2, 2020. (ECF No. 18). A hearing on the motion was held by Zoom video conference on July 1, 2020. (ECF No. 30).

Following a thorough review of the motion, response, the briefs, dash camera video, exhibits, and witness testimony in this case, and for the reasons stated below, it is recommended that the Motion to Suppress (ECF No. 17) be GRANTED.

**I.     Background**

On February 3, 2020, Mr. Grant was driving a white Honda Accord traveling eastbound on Interstate 40 in Crawford County, Arkansas. At approximately 8:33:36 a.m., Arkansas State Trooper Johnathan Bass initiated a traffic stop of Mr. Grant because Trooper Bass believed Mr. Grant was following a large commercial truck too closely. Dash camera ("dash cam") video from Trooper Bass' low-profile police vehicle documents approximately one minute and 10 seconds preceding the traffic stop.

At the start of the dash cam video, Mr. Grant is seen driving in the right lane with no vehicles ahead of him. The red hood of Trooper Bass' low-profile police vehicle can be seen slightly behind Mr. Grant in the left lane. About 10 seconds into the video, Trooper Bass enters

1

the right lane immediately behind Mr. Grant. Trooper Bass then follows Mr. Grant for approximately 40 seconds as a large auto-hauler truck and a white SUV drive past Trooper Bass in the left lane. The truck and SUV are travelling at a faster rate of speed than Mr. Grant and Trooper Bass. As the truck and SUV continued to pull ahead in the left lane, Trooper Bass moves over into the left lane behind them. The SUV appears to be travelling at a faster rate of speed than the truck, and it rapidly closes the distance between them.

Approximately 55 seconds into the video, Mr. Grant is in the right lane, the SUV is directly beside Mr. Grant in the left lane, and the truck is slightly ahead of the SUV in the left lane. It appears the driver of the truck is anxious to move over into the right lane as the SUV is rapidly closing from behind. The truck uses its right turn signal to indicate a lane change and begins to enter the right lane. Approximately 58 seconds into the video, Mr. Grant is in the right lane, the SUV is beside and slightly ahead of Mr. Grant in the left lane, and the truck completes the lane change just ahead of Mr. Grant. Trooper Bass remains in the left lane for approximately 12 seconds until he engages his blue lights to initiate the traffic stop of Mr. Grant. Mr. Grant engages his right turn signal to indicate his intention to pull over and does so when both vehicles approach a grassy area beyond the shoulder of the highway after passing over a bridge.

The dash cam video continues after the traffic stop. Trooper Bass approaches the passenger side of the white Honda Accord and informs the occupants that he stopped the vehicle because it had drifted over the shoulder and was "a little too close to that truck." He asks the occupants if everything was okay. He requests Mr. Grant's driver's license and vehicle registration, and Mr. Grant presented a few separately folded documents. Trooper Bass asks if one of the documents is Mr. Grant's insurance. Though Mr. Grant's response is inaudible from the video, Trooper Bass

2

can be heard confirming that the document is Mr. Grant's driver's license, which was in paper form because the card form had expired.

After checking Mr. Grant's driver's license and the vehicle registration from the police vehicle, Trooper Bass returns to the passenger window to ask the passenger if the vehicle was registered to her. Her response is inaudible, but Trooper Bass then asks whose vehicle it was. After Mr. Grant's inaudible response, Trooper Bass asks for confirmation that the owner was not present. He obtains the passenger's identification and asks for confirmation that Mr. Grant had permission from the owner to drive the vehicle. Trooper Bass then asks Mr. Grant to step out of the vehicle and tells him there was no return on his driver's license.

Mr. Grant stands with Trooper Bass in front of the low-profile police vehicle. Trooper Bass tells Mr. Grant that he is not in trouble and asks him to explain the format of his driver's license document. Mr. Grant states that the paper format was given to him to use when his license expired and until the new license arrives in the mail. Trooper Bass asks, "before they send you a hard copy?" Mr. Grant answered in the affirmative and nodded his head. Trooper Bass then asks Mr. Grant to sit in the front seat of the police vehicle with him.

Inside the police vehicle, Trooper Bass questions Mr. Grant about his itinerary. Mr. Grant explains that they are on their way home from Los Angeles where they were visiting the Kobe Bryant memorial. After running Mr. Grant's identifying information through the system, Trooper Bass learned that Mr. Grant's criminal history included narcotics charges. Trooper Bass then asks for consent to search the vehicle and Mr. Grant declined, stating that he did not know why he was pulled over in the first place. Trooper Bass states he was checking on Mr. Grant after he drifted over the fog line and followed the truck too closely.

Trooper Bass contacts a K9 unit and tells Mr. Grant that a canine officer will conduct a drug sniff of the vehicle. He asks Mr. Grant to exit the police vehicle and stand in front of it. Another officer arrives at the scene and speaks with Trooper Bass through the passenger window of his police vehicle. The officer then speaks with Mr. Grant in front of Trooper Bass' police vehicle.

The K9 unit arrives and Mr. Grant's passenger stood away from the vehicle with the other officer. Arkansas State Police Cpl. Mike Bowman handled the canine officer who conducted a drug sniff and alerted to the presence of contraband in the vehicle. The officers then searched the vehicle while Mr. Grant and the passenger sat in the backseat of separate police vehicles. The search revealed approximately 28.68 pounds of suspected cocaine in a modified compartment of the vehicle's console. Mr. Grant was then handcuffed and returned to sit in the backseat of Trooper Bass' police vehicle.

On February 19, 2020, a Criminal Complaint was filed charging Mr. Grant with knowingly possessing with intent to distribute cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1). (ECF No. 1). An initial appearance was held on February 21, 2020, and Mr. Grant waived the issues of probable cause and detention. (ECF No. 7). An Indictment was issued on March 4, 2020, charging Mr. Grant with knowingly possessing with intent to distribute more than five kilograms of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(ii). (ECF No. 11). Mr. Grant was arraigned on March 11, 2020, at which time he entered a not guilty plea to the Indictment. (ECF No. 14).

Mr. Grant's pending Motion to Suppress (ECF No. 17) seeks the suppression of all evidence obtained from the search. He argues that the initial traffic-stop and subsequent search

were unconstitutional because (1) the stop was not based on probable cause, and (2) the stop was pretextual. Thus, he contends, the "fruit of the poisonous tree" doctrine precludes the introduction of all evidence seized from the stop and subsequent search. In its Response (ECF No. 20), the Government contends probable cause existed for the traffic stop and the stop was not based on pretext.

A hearing on the motion was conducted by Zoom video conference on July 1, 2020. (ECF No. 30). The State Trooper's dash camera video was received in evidence as Joint Exhibit 1. (ECF No. 30-1). The dash camera video consists of two video files, of the same duration, but one depicts a forward view, while a second depicts a view of the interior of the police vehicle. The Government called two witnesses to testify at the motion hearing, Arkansas State Police Trooper Johnathan Bass and Arkansas State Police Sergeant Derek Neitert, and Government's Exhibit 1 (a summary of traffic stops initiated by Trooper Bass) was received in evidence. (*Id.*). Defendant's Exhibits 1 – 7 (still shots from the dash camera video) were also received in evidence. (*Id.*).

## II.  Discussion

A traffic stop must be reasonable because it implicates Fourth Amendment protections against unreasonable seizures. *Whren v. United States*, 517 U.S. 806, 809-10 (1996). A reasonable traffic stop is one based upon probable cause or reasonable suspicion. *United States v. Washington*, 455 F.3d 824, 826 (8th Cir. 2006). Traffic stops based on pretext violate the Fourth Amendment. *United States v. Fuehrer*, 844 F.3d 767, 772-73 (8th Cir. 2016). However, when an objectively reasonable officer could have concluded that a driver committed even a minor traffic violation, probable cause exists to stop the driver. *United States v. Martinez*, 358 F.3d 1005, 1009 (8th Cir. 2004). A mistake of law or fact resulting in a search or seizure must still be objectively reasonable as an officer's subjective good faith alone cannot justify a stop. *United States v. Martin*, 411 F.3d

998, 1001 (8th Cir. 2005). If an officer is mistaken about the traffic violation, the traffic stop violates the Fourth Amendment unless the mistake was an objectively reasonable one. *Washington*, 455 F.3d at 826; *see United States v. Herrera-Gonzalez*, 474 F.3d 1105, 1109 (8th Cir. 2007) (finding that the subjective intentions and actual motivations of the officer making a traffic stop are irrelevant to its validity and do not determine the constitutional reasonableness of the stop); *Martin*, 411 F.3d at 1001-02.

### A.     Pretext

Mr. Grant contends that "the traffic stop in this case was merely pretextual." (ECF No. 17, p. 5). He further alleges, "[i]t is apparent that Trooper Bass saw Mr. Grant, an African-American man, driving an out-of-state vehicle and intended to investigate further." (*Id.*, p. 6). Trooper Bass testified that he could not see the race or gender of the driver of the white Honda Accord until after the traffic stop.

There is insufficient evidence before the Court to support Mr. Grant's argument that the traffic stop was a pretext for investigating him based on his race. The dash cam video simply does not show that Mr. Grant's race was visible to Trooper Bass before the initial stop. Rather, the question is whether it was objectively reasonable for Trooper Bass to conclude that Mr. Grant violated a traffic law to support the initial stop.

### B.     Probable Cause

**1.     Following Too Closely**

Under Arkansas law, it is a traffic violation for a driver to follow another vehicle "more closely than is reasonable and prudent, having regard for the speed of the vehicles and the traffic upon and the condition of the highway." Ark. Code Ann. § 27-51-305(a). This Court[1] found that

---

[1] The Honorable P.K. Holmes, III, United States District Judge for the Western District of Arkansas.

probable cause exists to support a traffic stop when "an objectively reasonable officer would determine" that a driver was following a vehicle "too closely in light of the road conditions and traffic." *United States v. Cox*, No. 2:19-cr-20024, 2019 WL4197604 at *3 (W.D. Ark. Sept. 4, 2019), *appeal filed*, No. 20-2039 (8th Cir. filed May 26, 2020). In *Cox*, it was objectively reasonable for the trooper to conclude that the defendant was "a little bit close." *Id*. The Court noted that the defendant's actions—steadily accelerating and closely approaching the vehicle in front of him—caused the situation. *Id*. Even after temporarily decelerating, the defendant accelerated again even as both vehicles passed a sign notifying drivers of an approaching rest area exit. *Id*. The defendant continued to steadily approach the vehicle ahead of him until he was so close that he was "forced to quickly apply his own brakes" when the vehicle ahead slowed down to exit. *Id*. Based on the defendant's actions, the road conditions, and traffic, the Court found there was probable cause to support the traffic stop in *Cox*. *Id.*

An officer does not, however, have probable cause to believe a driver committed the traffic offense of following too closely when another vehicle pulls in front of the driver and the officer does not allow sufficient time for the driver to correct the situation he did not cause. *Pargament v. State*, 2019 Ark. App. 311 (Ark. Ct. App. 2019). The trooper in *Pargament* was driving in the left lane on Interstate 40 when he observed the defendant's vehicle in the right lane. Another vehicle changed lanes and pulled in front of the defendant's vehicle and, at that point, the defendant was driving too closely to the other vehicle. *Id*. at *2. After following the defendant for "a little bit" to give the defendant an opportunity to change lanes, go around the vehicle, or reduce his speed, the trooper activated his blue lights to initiate the traffic stop of the defendant for following too closely. *Id*.

The Arkansas Supreme Court held that 30 seconds was not enough time to allow a driver to correct a situation he did not cause, namely that another driver pulled into his lane, such that an officer would have probable cause to believe a traffic violation of following too closely had occurred. *Id*. at *5. The trooper testified that the defendant was not traveling too fast and suddenly approached the back of the other vehicle; but rather, "the only reason Pargament was following too closely was because the other vehicle had pulled in front of him." *Id*. at *4. Further, dash cam video showed that the trooper followed the defendant for only about 30 seconds before activating his blue lights to initiate the traffic stop. *Id*. The trooper testified that the vehicle in front of the defendant had accelerated and pulled ahead slightly within those 30 seconds. *Id*. The trooper also acknowledged that if he had waited another 10 seconds before stopping the defendant, the distance between his vehicle and the one that pulled in front of him would have increased. *Id*.

The facts in the case at bar are nearly identical to the facts in *Pargament* and significantly dissimilar to those in *Cox*. On February 3, 2020, Trooper Bass was driving in the right lane of Interstate 40 behind Mr. Grant's vehicle. A large, empty auto-hauler truck was passing in the left lane and an SUV was behind it. As the passing vehicles moved by, Trooper Bass changed lanes into the left lane behind the SUV. The SUV accelerated and closed the space between itself and the truck in front of it, causing the truck to quickly change lanes into the right lane in front of Mr. Grant. Trooper Bass then activated his lights to initiate the traffic stop of Mr. Grant.

Trooper Bass did not give Mr. Grant enough time to correct a traffic situation he did not cause. He gave Mr. Grant, at most, only 15 seconds to increase his distance from the truck after it entered the right lane ahead of him. The dash cam video shows that the truck signaled that he was entering Mr. Grant's lane at the 00:55 mark. The truck completes the lane change by the 00:58 mark, at which time there appear to be approximately two dashed lines, or about 80 feet, between

8

the truck and Mr. Grant's vehicle.[2] At the 01:05 mark of the video, there appear to be three dashed lines between the vehicles, showing that the distance between the two vehicles was increasing. Trooper Bass activated his blue lights at the 01:10 mark, at which time there appear to be nearly four dashed lines between the truck and Mr. Grant's vehicle. Thus, the dash cam video establishes that from the moment the truck driver signaled a lane change to the moment Trooper Bass activated his lights, Mr. Grant had just 15 seconds to adjust to the auto-hauler truck pulling closely in front of him.

Even within the unreasonable timeframe of 15 seconds, an objectively reasonable officer would not conclude that Mr. Grant was following too closely. There were no other vehicles ahead of Mr. Grant until the truck suddenly entered his lane. As the truck signaled and completed the lane change, Mr. Grant did not accelerate towards it, but rather, he slowed and allowed the truck to accelerate and increase the distance between them. At no point did Mr. Grant appear to gain on the truck. The space between the vehicles only steadily increased. He maintained at least two dashed lines between them, and, within five seconds of entering Mr. Grant's lane, the truck began to pull away from Mr. Grant's vehicle.

Further, it was reasonable that Mr. Grant did not attempt to change lanes to go around the truck. As the truck entered Mr. Grant's lane, the SUV was beside Mr. Grant in the left lane. Trooper Bass also remained in the left lane. Notably, even as the SUV pulled ahead, Trooper Bass remained in the left lane until he initiated the stop. It was reasonable for Mr. Grant to remain in the right lane behind the truck, which was gradually pulling away, rather than enter the left lane in front of Trooper Bass.

---

[2] We take judicial notice that interstate broken white lines consist of 10-foot line segments and 30-foot gaps. U. S. Department of Transportation, Federal Highway Administration, Manual on Uniform Traffic Control Devices (MUTCD), 2009 Edition, Section 3A.06, Guidance 04.

The dash cam video clearly shows that the proximity, the closeness, of Mr. Grant's vehicle to the truck ahead of him was not the result of any action he took, but instead, was caused by the driver of the truck. The Court in *Pargament* found 30 seconds insufficient for a trooper to initiate a stop for following too closely under almost identical circumstances, but Trooper Bass only gave Mr. Grant 15 seconds to react to the traffic conditions he did not cause. *Pargament* controls and results in the conclusion that Trooper Bass did not have probable cause to stop Mr. Grant for following too closely.

**2.      Crossing the Fog Line**

The Government alternatively contends that probable existed to support the traffic stop because Trooper Bass observed Mr. Grant drift across the fog line one time. They concede that the dash cam video does not depict Mr. Grant crossing the fog line.

Probable cause has been found to support a traffic stop where the driver of a car crossed the fog line twice within two miles at 1:50 a.m. *See United States v. Pulliam*, 265 F.3d 736, 739 (8th Cir. 2001) (finding the state trooper had sufficient probable cause to stop a driver for drifting over the fog line twice in two miles in violation of Arkansas law), citing *United States v. Barberena-Jimenez*, 1996 WL 83002, at *2 (8th Cir. Feb. 28, 1996) (defendant was observed crossing over the fog line several times). In *United States v. Ozbirn*, 189 F.3d 1194, 1198 (10th Cir. 1999), the Tenth Circuit found that a state trooper had probable cause to stop the driver of a motorhome for drifting over the fog line twice within a quarter mile under optimal road, weather, and traffic conditions in violation of Kansas law. The case law, however, does not support probable cause for a traffic stop when a driver crosses the fog line only once several miles before the stop. In *Ozbirn*, the Court stated, "[w]e agree that under the language of the Kansas statute[3],

---

[3] The Kansas statute, Kan. Stat. Ann. § 8-1522, which requires that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane," is substantially similar to the Arkansas statute, Ark. Code Ann. § 27-51-302(1), which

10

when an officer merely observes someone drive a vehicle outside the marked lane, he does not automatically have probable cause to stop that person for a traffic violation." *Id.*, at p. 1198.

Here, Trooper Bass testified that he observed Mr. Grant cross the fog line only once approximately three to five miles before the dash cam video began recording. There is no video evidence of this occurrence. There is also no video evidence of Mr. Grant crossing the fog line after the dash cam began recording up until Trooper Bass stopped him. Given Trooper Bass' testimony and the video evidence available, it would be generous to say that Mr. Grant crossed the fog line once in about four to seven miles prior to the traffic stop. Further, Trooper Bass testified that he did not stop Mr. Grant for crossing the fog line when he observed it because it was not enough of a concern to initiate a traffic stop. Thus, it was not objectively reasonable for Trooper Bass to stop Mr. Grant for one isolated incident of crossing the fog line.

The Government argues as an additional basis that Mr. Grant's driving behavior gave Trooper Bass reason to believe that Mr. Grant was impaired or fatigued. The Government contends that Mr. Grant was weaving within his lane, drifting towards the fog line, and following the truck too closely when it posed a safety hazard to him with "loose gravel that could be kicked up and break the vehicle's windshield." (ECF No. 20, p. 7). Case law, however, firmly holds that weaving within one's lane of traffic does not constitute a traffic offense. *See Barrientos v. State*, 72 Ark. App. 376, 382-83 (2001) (a car weaving between the boundaries of its designated lane on a multi-lane highway, combined with an officer's concern that the driver might be sleepy, does not constitute probable cause to stop); *Ford v. State*, 2010 Ark. App. 795 (2010). Trooper Bass testified to observing the alleged weaving and drifting just once during his testimony. He did not

---

provides that "[a] vehicle shall be driven as nearly as practical entirely within a single lane and shall not be moved from the lane until the driver has first ascertained that movement can be made with safety."

testify about any safety hazard because of loose gravel.  Further, the dash cam video evidence does not support the assertion that Mr. Grant's driving behavior suggested he was impaired or fatigued.

The video evidence does not show any evidence of weaving, drifting, or the presence of loose gravel on the road or truck.  Instead, it shows Mr. Grant steadily maintaining his lane and moving slightly to the right when the truck passes by him on the left.  This movement appears to be a purposeful attempt to give the truck ample room beside him.  Moreover, Mr. Grant did not cross the fog line even as he moved towards the right side of the lane.  This behavior does not resemble that of an impaired or tired driver.  To the contrary, it shows that Mr. Grant was alert and cautious about the traffic around him and precise about the placement of his vehicle within his lane.  There is no evidence of loose gravel posing an additional safety hazard that would obligate Mr. Grant to be more cautious than usual.  Thus, even if Mr. Grant crossed the fog line once approximately four to seven miles before the traffic stop, the evidence presented does not support Trooper Bass' belief that Mr. Grant may be impaired or fatigued.

An objectively reasonable officer could not have concluded that Mr. Grant committed even a minor traffic violation.  Accordingly, the traffic stop was not supported by probable cause and the subsequent search violated the Fourth Amendment.

## IV.   Conclusion

For the reasons and upon the authorities discussed above, it is recommended that Mr. Grant's Motion to Suppress (ECF No. 17) be GRANTED, and that the evidence seized during the search of the vehicle be suppressed.

/s/ *Mark E. Ford*
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE